# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JANET MORRIS,
individually and on behalf of
all others similarly situated,

     Plaintiff,

                                         CLASS ACTION

v.                                    Case No: 8:22-cv-2048-CEH-AAS

LINCARE, INC.,

     Defendant.

_____/

## **O R D E R**

In this class action brought under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, et seq., and the Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059, Plaintiff Janet Morris, on behalf of herself and others similarly situated, sues Defendant Lincare, Inc., for unsolicited prerecorded calls made by Defendant to the class members' cellular telephones. Before the Court are the parties' cross motions for summary judgment (Docs. 188, 189); responses in opposition (Docs. 194, 195), replies (Docs. 197, 198), and supplemental briefing (Docs. 245, 250). The Court heard argument on the motions on September 2, 2025. Having considered the motions and the parties' written submissions, and argument of counsel, and being fully advised in the premises, the Court will grant Defendant's Motion for Summary Judgment as to the TCPA claim and deny Plaintiff's motion on

that claim. The Court declines to exercise supplemental jurisdiction as to the FTSA claim and will dismiss the FTSA claim without prejudice.

## I.    BACKGROUND[1]

### A.    Stipulated Facts

Defendant Lincare Inc. ("Defendant" or "Lincare") sells continuous positive airway pressure ("CPAP") equipment and related durable medical supplies. Doc. 193 ¶ 1. Lincare's parent company is Lincare Holdings, Inc. *Id.* ¶ 2. American HomePatient is another durable medical equipment provider that provided CPAP devices and supplies. *Id.* ¶ 3. Morris purchased CPAP supplies multiple times between April 2015 and October 2016 from American HomePatient ("AHP"). AHP is also a subsidiary of Lincare Holdings, Inc. *Id.*

On April 24, 2015, Morris's physician diagnosed her with obstructive sleep apnea and prescribed her a CPAP device. *Id.* ¶ 4. On May 12, 2015, Morris selected AHP as her CPAP supplier. *Id.* ¶ 5. On that same date, when Morris first signed up for CPAP therapy at her local AHP office and prior to receiving any calls from AHP or Lincare, Morris signed a consent form which stated:

> I attest the above information is correct. I authorize the direct billing to Medicare, Medicaid, Medicare Supplemental, and/or private health insurance on my behalf by American HomePatient and/or its corporate affiliates, agents, and assigns. If signed by someone other

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including affidavits, depositions, and exhibits, as well as the parties' Stipulation of Agreed Material Facts (Doc. 193). For purposes of summary judgment, the Court presents the facts in the light most favorable to the non-moving party, as required by Fed. R. Civ. P. 56.

> than I acknowledge I have the authority to sign on behalf of the patient. Further, by SIGNING BELOW I hereby expressly agree to receive calls by or on behalf of American HomePatient regarding treatment options, health-related information, disease-management programs, wellness programs, products, services, or other community-based initiatives or activities related to my care. I have received, read and understand THE TERMS OF AGREEMENT AND AGREE TO BE BOUND BY THE TERMS OF THE AGREEMENT. I acknowledge receipt of the Company's Notice of Privacy Practices.

*Id.* ¶ 6; *see also* Doc. 188-1 at 20.

On March 13, 2018, Lincare sent patients, including Morris, a letter informing them that AHP had joined with Lincare, and stating that "[m]oving forward, your respiratory supplies and support will be serviced by your local Lincare Center." Doc. 193 ¶ 7. The letter was sent on AHP letterhead and was signed by "Your American HomePatient Team." Doc. 188-1 at 23. The letter advised Morris "that American HomePatient has officially joined with Lincare," and if she should need assistance or have any questions, she should contact the Lincare Center. *Id.* A telephone number and address for the Lincare Center in Jacksonville, Florida were provided in the letter. *Id.* There is no dispute on the record about Morris's receipt of the letter.

The prerecorded voice calls at issue in this case were made to Morris by Lincare's CPAP Call Center. Doc. 193 ¶ 8. Lincare's computer-generated Call Logs reflect calls that were placed by Lincare's CPAP Call Center. *Id.* ¶ 9. Lincare's Call Logs consist of (1) the telephone numbers Lincare acquired from American Home Patient (reflected by a Company designation of "American HomePatient"); (2) the date and time a number was called with a prerecorded message; (3) whether a

3

prerecorded message was played during the call (reflected by a "AMD_Application_Played" designation); and (4) whether the telephone number called was a cellular telephone (reflected by a "Yes" Cell Phone). *Id.* ¶ 10; *see also* Doc. 189-4. If the patient does not answer the phone, Lincare leaves a prerecorded voice mail: "This is your supply center, calling you with an important message regarding your supplies. Please give us a call back at 1-888-544-2715." Doc. 193 ¶ 11. Within the Call Logs produced by Lincare, each call dispositioned as "AMD_Application_Played" consisted of the prerecorded message requesting a call back to "your medical supply company." *Id.* ¶ 12. Lincare's Call Logs reflect prerecorded calls made to Morris's cellular telephone. *Id.* ¶ 13.

### B.    Procedural Background

On September 6, 2022, Morris sued Lincare in a putative class action. Doc. 1. In her Second Amended Complaint filed August 18, 2023, Morris alleges that Lincare engaged in unsolicited robocalling to promote its goods and services, in violation of the TCPA and the FTSA. Doc. 51 ¶ 3. Morris alleges that beginning on September 21, 2020, Lincare sent unsolicited and unconsented to prerecorded voice calls to Morris's cellular telephone. *Id.* ¶ 14. Morris was in Florida when she received the sales calls to her cellular telephone number. *Id.* ¶¶ 18, 19.

In Count I of the Second Amended Complaint, Morris alleges that Lincare used prerecorded messages to make non-emergency calls to her cellular telephone in violation of 47 U.S.C. § 227 and 47 C.F.R. § 64.1200. *Id.* ¶¶ 40–43. In Count II, Morris sues Lincare for violation of the FTSA, Florida's statutory counterpart to the TCPA.

*Id.* ¶¶ 48–55. She alleges that Lincare made or knowingly allowed sales calls to be made to Morris's cellular telephone without her prior express written consent in violation of the FTSA. *Id.* ¶¶ 52–53. She claims she was harmed and seeks statutory damages for each violation of the statute. *Id.* ¶ 54. Lincare moved to dismiss the Second Amended Complaint (Doc. 57), which the Court granted-in-part to the extent that the Court dismissed Morris's request for injunctive relief (Doc. 125). Otherwise, the motion to dismiss was denied and Lincare was directed to file an answer. *Id.* at 14. On June 7, 2024, Lincare filed its Answer and Affirmative Defenses, raising the defenses of consent and the applicability of the health care exception, among other defenses. Doc. 129.

On June 6, 2024, Morris moved for class certification, which the Court granted.[2] Doc. 127, 200. In her motion for class certification, Morris argued that her claims were typical of the class and that common issues, including the issue of consent, predominate. Doc. 127 at 18–21.

On January 16, 2025, the parties filed cross motions for summary judgment. Docs. 188, 189. In support of its motion, Lincare submitted the January 14, 2025 affidavit of Heather Brightwell (Doc. 188-1), the deposition of Morris (Doc. 188-2), the deposition of Brightwell (Doc. 188-3); Plaintiff's discovery responses (Doc. 188-4), and the March 6, 2024 deposition of Brandee Childres (Doc. 195-3). For her part,

---

[2] In her motion for summary judgment, Morris requested a ruling on the class certification motion before a ruling on the merits to avoid running afoul of the one-way intervention rule. Doc. 189 at 1 n.1.

Morris filed the March 6 and June 5, 2024 depositions of Childres as the corporate representative for Lincare (Docs. 189-1, 189-2), Lincare's interrogatory responses (Doc. 189-3), Lincare's Call Logs (Doc. 189-4), Morris's deposition (Doc. 189-5), Supplemental Declaration of Aaron Woolfson (Doc. 189-6), August 19, 2024 affidavit of Heather Brightwell (Doc. 189-7), deposition of Christopher Midgyett (Doc. 189-8); and the deposition of Brightwell as corporate representative of Lincare (Doc. 189-9).

Additionally, the parties filed a Stipulation of Agreed Material Facts (Doc. 193), and Plaintiff filed a notice of supplemental authority (Doc. 201). Pursuant to the Court's direction, the parties filed supplemental briefing on the issue of whether the Court's ruling on Lincare's summary judgment motion should bind the absent class members. *See* Docs. 245, 250.

### C.    Morris's Discovery Responses and Deposition

Morris states in interrogatory responses that she received calls to her cellular telephone ending in -7067 from Defendant Lincare on September 21, 2020; November 23, 2020; July 6, 2021; August 3, 2021; and September 9, 2021. Doc. 188-4 at 3. Lincare's Call Logs reflect at least 20 calls to Morris's cellphone number. *See* Doc. 189-4 at 969–70.

Both parties filed copies of the deposition of Morris in support of their respective motions. *See* Docs. 188-2, 189-5.[3] Morris testified that in April 2015 she participated in a sleep study which resulted in a diagnosis of obstructive sleep apnea. Doc. 189-5 at

---

[3] To promote clarity, since the deposition transcript page number and CM/ECF page number match, the Court will cite to the Morris deposition at Doc. 189-5.

43. She began using a CPAP machine after being diagnosed with sleep apnea. *Id.* at 18–19. She does not currently use a CPAP machine but knows that she needs to do something to treat her sleep apnea condition. *Id.* at 19. She recognizes the risks of not using a CPAP machine and leaving her sleep apnea untreated, including that her breathing could stop in the middle of the night, she could suffer heart failure, heart attack, stroke, high blood pressure, or shortened life span. *Id.* at 20–21. After her diagnosis, she chose AHP to service her CPAP supply needs. *Id.* at 24. On March 12, 2015, she provided her cell phone number and signed a form expressly agreeing to receive calls "by or on behalf of American HomePatient." *Id.* at 56–57. Morris testified she gave permission to be contacted by AHP or anyone on its behalf "[a]t that moment in time, in 2015" (*id.* at 57), "not for whatever years later." *Id.* at 77. However, she acknowledged she never told AHP that she no longer wanted to be contacted. *Id.* at 57, 77.

A July 6, 2015, doctor's note reflected Morris did not need a new CPAP machine, but she would need supplies for approximately eight years. *Id.* at 60–62. Morris's first order of supplies from AHP was around July 17, 2015. *Id.* at 48. There were no other supply companies she used before using AHP, but she started using Amazon at some point after AHP because the supplies were much cheaper from Amazon. *Id.* at 24. AHP gave her a guideline for reordering supplies, and she tried to follow it. *Id.* at 49. Her next order date from AHP was October 20, 2015, and then again on February 2, 2016. *Id.* at 50–51. Each order consisted of headgear, tubing,

disposable filters, nasal pillows, and most of the time, a dehumidifier chamber. *Id.* at 52. Morris testified she was not good at remembering when to call and so the orders may have been scheduled to auto-ship. *Id.* at 53. Morris was using the supplies when they were shipped to her; she needed them for her CPAP machine. *Id.*

Morris testified that she never had a relationship with Lincare. *Id.* at 63. Her relationship was with AHP, but she does not recall ever having to call AHP for anything other than the initial fitting of the machine. *Id.* at 64–65.

Morris has had the same cellular telephone number ending in -7067 for as long as she can remember. *Id.* at 28–29. When she received the prerecorded messages, she never called the number back to tell them not to contact her. *Id.* at 67. As the message referenced only a "medical supply company," she did not know who the message was from or whether it was legitimate. *Id.* at 67–68. She knew nothing about Lincare because it never identified itself. *Id.* at 78. After a while, she blocked the number that she was receiving calls from. *Id.* at 68.

### D.    Affidavit of Heather Brightwell

Heather Brightwell is a certified respiratory therapist and is the current head of the Lincare Call Center for CPAP medical devices.  Doc. 188-1 ¶¶ 3, 5. Brightwell worked at Lincare when it acquired American HomePatient, Inc. on February 1, 2016. *Id.* ¶ 6. As part of the acquisition, Lincare and AHP executed an intercompany agreement in which Lincare agreed to provide call center services for AHP locations that continued to operate, including the one that served Morris. *Id.* In 2018, Lincare

combined its local center in Jacksonville with the AHP local Jacksonville center. *Id.* In March 2018, patient files of AHP patients who had agreed to be contacted on behalf of AHP and who had placed orders with AHP in the preceding 18 months were transferred into Lincare's patient database. *Id.* ¶ 6. An earlier-filed Affidavit of Brightwell stated that in 2018 "Lincare moved the AHP Jacksonville patients to the Lincare Jacksonville center establishing new patient profiles for those transferred patients." Doc. 189-7 ¶ 6. In March 2018, the Lincare CPAP center took over patient care and re-supply responsibilities for the transferred AHP patients. Doc. 188-1 ¶ 8.

A physician or a sleep lab must write a prescription for the patient in order to receive a CPAP medical device and its related supplies. *Id.* ¶ 21. According to AHP's records, Morris ordered supplies from AHP on July 17, 2015; October 20, 2015; February 2, 2016; and October 17, 2016. *Id.* ¶¶ 29–32.

Lincare created a patient file for Morris on February 15, 2018 and sent her a letter on March 13, 2018, informing her that Lincare was taking over the servicing of her CPAP supply needs from AHP. *Id.* ¶ 34. Lincare placed supply refill reminder calls to Morris's cell phone number that she had provided to AHP. *Id.* ¶ 35. Morris never contacted AHP to inform them that she no longer wanted to be called regarding her CPAP supplies. *Id.* ¶ 36. Lincare placed Morris on the "Do not call" list after she filed this lawsuit. *Id.* ¶ 37.

### E. The Parties' Motions

1. Lincare's Motion for Summary Judgment (Doc. 188)

Lincare moves for summary judgment on both the federal TCPA claim and the related state law claim under the FTSA arguing that (1) Lincare's calls to Morris fall under the TCPA's Health Care Rule and therefore required only prior express consent which was given by providing her phone number; (2) Lincare obtained Morris's prior express consent via its predecessor entity AHP, on whose behalf Lincare made the calls; (3) Even if the calls were not subject to the Health Care Rule, Lincare obtained Morris's express written consent; and (4) Morris's FTSA claim fails because the calls were not "telephonic sales calls" under the statute and she suffered no actual damages. Alternatively, Lincare asserts that if the Court disposes of Morris's TCPA claim, it should decline jurisdiction of the state statutory claim.

Lincare argues the calls placed to Morris and the class were "health care messages" as defined by the regulations governing the TCPA. Thus, Lincare contends the Health Care Rule (not the telemarketing rule) governs Lincare's prerecorded messages. If the Health Care Rule applies, only prior express consent (not written consent) is required. *See* 47 C.F.R. § 64.1200(a)(2). Lincare argues it obtained Morris's prior express consent because Morris gave AHP her phone number and signed the consent form, and AHP transferred Morris's consent to Lincare as part of the acquisition. Lincare informed Morris of the transition in its post-acquisition letter notifying AHP's clients that it was "stepping into the shoes" of AHP and making the calls "on behalf of" AHP. Lincare urges that, alternatively, prior express consent may be transferred through an intermediary. Finally, Lincare argues that even if the Health Care Rule does not apply and the Court looks to the Telemarketing Rule, Lincare

10

argues it substantially complied with the prior written consent as well such that the
calls did not run afoul of the TCPA.

    2.    Morris's Motion for Summary Judgment (Doc. 189)

Morris moves for summary judgment on behalf of herself and the class members
on her claims under the TCPA and FTSA seeking statutory damages for each call
placed to them in violation of the statutes. Morris submits that the prerecorded voice
calls were made to her and the class members from Lincare's Call Center which is
staffed by sales representatives who have the singular goal of placing as many calls as
possible to make sales regardless of the individual medical needs of those called and
notwithstanding that Lincare had no information regarding Plaintiff or the class
members' personal health circumstances. Morris's phone number (as well as for all
others called) was obtained by Lincare from AHP. Morris contends she never gave her
number to Lincare and never authorized Lincare to call her.

Morris argues there is no dispute that Lincare called her and the class members
using a prerecorded voice message. She next argues that the calls were telemarketing
(not health care) calls because their purpose was to sell class members CPAP
equipment and supplies. She argues that the Court must consider whether the context
of the call was a pretext to make sales (pretext to a commercial transaction), which she
claims this was. She argues the calls were made by telemarketers, who had no
individualized information regarding the people they called. The purpose of the calls
was to encourage a call back to a sales rep to purchase supplies. The callers engaged
in "education rebuttal" in response to any resistance to purchase. Since the purpose of

the call was to encourage the purchase of goods, Morris argues the calls are governed by the telemarketing rule and Lincare's defense of consent fails because it failed to secure valid express written consent from Morris and the class.

Even if the Health Care Rule applied and only prior express consent (not written consent) was required, Morris argues she is still entitled to summary judgment because she gave her phone number to AHP, not Lincare, and the form she and the class members signed said nothing about their phone numbers being transferred. According to Morris, she and the class members never consented to their numbers being transferred and never consented to receiving prerecorded calls from Lincare.

## II.    APPLICABLE LAW

### A.    Summary Judgment Legal Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). Cross-motions may, however, be probative of the absence of a factual dispute

where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## B.    TCPA

In relevant part, § 227(b)(1)(A) of the TCPA provides:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States--
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice--
> …
> (iii) to any telephone number assigned to a … cellular telephone service, …

47 U.S.C. § 227(b)(1)(A)(iii).

The implementing regulations similarly state:

> No person or entity may:
> (1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice; . . .
> (iii) To any telephone number assigned to a . . . cellular telephone service, ….

47 C.F.R. § 64.1200(a)(1)(iii).

## III.    DISCUSSION

### A.    TCPA Claim

In general, the TCPA prohibits unsolicited phone calls that utilize prerecorded messages. 47 U.S.C. § 227(b)(1)(A)(iii). The FCC has promulgated exceptions to the TCPA for certain calls related to health care. Referred to as the "Health Care Rule," this exception, codified in paragraph (a)(2) of § 64.1200 of the regulations, provides:

> No person or entity may:

> Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call . . . delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

47 C.F.R. § 64.1200(a)(2).

Lincare contends the Health Care Rule exception applies to its calls because the calls delivered a "health care" message and Lincare is a "covered entity" as contemplated by the regulations. Under HIPAA, "covered entity" includes "(3) [a] health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter." 45 C.F.R. § 160.103. And "health care" includes the "[s]ale or dispensing of a drug, device, equipment, or other item in accordance with a prescription." *Id.* Lincare argues it obtained Morris's prior express consent to be called when she provided her cellular telephone number to AHP and consented to receive calls "by or on behalf of" AHP. Morris argues that the messages are primarily telemarketing and neither she, nor the class members, consented to calls from Lincare. Liability on Plaintiffs' TCPA claims turns on the issue of consent and the applicability of the Health Care Rule exception. The Court addresses each in turn below.

1.    Consent

a.    By Providing a Phone Number

15

Morris testified that she consented to be called by AHP, but not by Lincare, and she asserts that her consent was only "[a]t that moment in time, in 2015" (Doc. 189-5 at 57), "not for whatever years later." *Id.* at 77. But the record also shows she never gave instructions to the contrary. Whether Morris gave prior express consent to be called is an affirmative defense to a claim under the TCPA, *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1304–05 (11th Cir. 2015). Thus, Lincare bears the burden of establishing consent.

The FCC has explained that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1118 (11th Cir. 2014) (quoting In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 (1992 FCC Ruling), 7 FCC Rcd. 8752, 8769)). The Eleventh Circuit has confirmed that providing a cellular telephone number to a company "qualifies as prior express consent under the TCPA[.]" *Lawrence v. Bayview Loan Servicing, LLC*, 666 F. App'x 875, 881 (11th Cir. 2016). The record evidence shows Morris provided her cell phone number to AHP.

"On the issue of consent, the FCC has clarified 'that provision of a phone number to a healthcare provider constitutes prior express consent for healthcare calls subject to HIPAA by a HIPAA-covered entity and business associates acting on its behalf, as defined by HIPAA, if the covered entities and business associates are making calls within the scope of the consent given, and absent instructions to the contrary.'" *Jackson v. Safeway, Inc.*, No. 15-cv-4419-JSC, 2016 WL 5907917, at *10 (N.D. Cal. Oct.

11, 2016) (citing 2015 FCC Order, 30 FCC Red. at 8029 ¶ 141). As explained by the FCC, "within the scope of the consent given" means that calls or messages must be closely related to the initial purpose for which consent was provided. *Bailey v. CVS Pharmacy, Inc., No*. 17CV11482PGSLHG, 2018 WL 3866701, at *6 (D. N.J. Aug. 14, 2018) (citing 2015 FCC Order). However, courts that have addressed this "scope of consent" issue have understood the "closely related" requirement to be satisfied "so long as the call bears some relation to the reason for which the number was originally provided." 2018 WL 3866701, at *6 (citing *Jackson*, 2016 WL 5907917, at *10). The record evidence further supports that the number was provided to AHP by Morris for purposes of being contacted regarding her CPAP supplies. Thus, the calls fell within the scope of the consent given, and there is no record evidence of Morris or the class giving contrary instructions.

   b. Withdrawal of Consent

  A party may withdraw its consent at any time using any reasonable method. *See* 47 C.F.R. § 64.1200(a)(10) ("A called party may revoke prior express consent, including prior express written consent, to receive calls or text messages made pursuant to paragraphs (a)(1) through (3) and (c)(2) of this section by using any reasonable method to clearly express a desire not to receive further calls or text messages from the caller or sender."). "[O]ral revocation is sufficient to withdraw prior express consent." *Lawrence*, 666 F. App'x at 879.

  There is no record evidence that Morris gave contrary instructions or made any attempt, orally or in writing, to withdraw her consent. To that point, Morris testified

that she never told AHP that she no longer wanted to be contacted. Doc. 189-5 at 57, 77. Morris argues, however, that giving her consent to AHP in 2015 cannot mean that she is authorizing to be called at any point in time years into the future by a different entity. On the issue of how long the consent lasts, the Court need not make the determination as to whether the consent was given for an indeterminate amount of time into the future absent withdrawal. The record before the Court reveals Morris provided her phone number to AHP, she consented to be called regarding her CPAP supplies by or on behalf of AHP, her doctor's prescription indicated that she will need CPAP supplies for approximately eight years, she did not withdraw her consent to be called during those eight years, and she received messages to her cell phone regarding her supplies within the eight years. On these undisputed facts, prior express consent was provided to AHP. The Court turns next to whether Lincare could rely upon the consent provided to AHP.

c.    On Behalf of AHP

Morris argues she never gave consent to Lincare, a completely different entity. The consent form signed by Morris, however, indicates that she consented to receive calls by or "on behalf of" AHP regarding "treatment options, health-related information, disease-management programs, wellness programs, products, services…." Doc. 188-1 at 20. Thus, Lincare urges that it stepped into the shoes of AHP for purposes of servicing Morris's account. Morris argues there is no record evidence of the Lincare/AHP relationship because Lincare never placed into evidence the written agreement between Lincare and AHP regarding their business

arrangement. But Plaintiff's theory that Lincare is a completely different or unrelated entity is unpersuasive and unsupported by the record.

In March 2018, Lincare and/or AHP sent Morris a letter stating AHP has joined Lincare and that "[m]oving forward, your respiratory supplies and support will be serviced by your local Lincare Center." *Id.* at 23. In addition to this letter being before the Court on the instant motions, Heather Brightwell, head of the Lincare Call Center for CPAP medical devices, explains that Lincare and AHP executed an intercompany agreement in which Lincare would provide call center services for AHP locations that continued to operate, including the one that served Morris. Doc. 188-1 at 3. She further explained that in 2018, the Lincare and AHP Jacksonville Centers were combined. *Id.* In March 2018, patient files of AHP patients who had agreed to be contacted on behalf of AHP and who had placed orders with AHP in the preceding 18 months were transferred to Lincare's database, unless instructions to the contrary were received.[4] *Id.* at 4. As of that time, Lincare took over patient care and resupply responsibilities for the Jacksonville Center patients with the Lincare CPAP call centers handling the flow of CPAP telephone supply traffic for both Lincare and AHP, except calls placed to local centers by patients. *Id.* According to Brightwell, "[t]he purpose of assigning AHP's call center services to Lincare was to ensure that patients would continue to receive consistent and necessary health care services." *Id.* at 3. Other than

---

[4] Brightwell explained that patients who had asked not to be contacted by AHP, who had advised they were getting their CPAP supplies elsewhere, or who reported that they no longer had the medical device would have been excluded. Doc. 188-1 at 4.

Morris's speculation as to what may or may not be in the intercompany agreement, she has placed no evidence in the record to dispute the letter and Brightwell's affidavit about the transition.[5] Thus, although the Lincare/AHP intercompany agreement is not in the record, there is undisputed evidence of Lincare's taking over the handling of AHP patient care to ensure the patients had continuous care and that Morris and the class was advised of that transition by letter.

Morris argues that the "on behalf of" language contained in the signed consent form means that anyone acting for AHP must be doing so for AHP's benefit. With this explanation, Morris goes on to argue that since Lincare was contacting Morris solely for Lincare's own benefit to make a sale and enrich itself, it could not be acting "on behalf of" AHP. Morris's reading of "on behalf of" is too narrow. "On behalf of" can refer to "as the agent of," "on the part of," or "for the benefit of." AMER. HERITAGE DICT., HarperCollins, 5th Ed. (2022).[6] Thus, the Court rejects Morris's premise that Lincare had to be acting solely for the benefit of AHP when it called her.

Lincare alternatively argues that consent may be obtained through an intermediary, and Eleventh Circuit caselaw supports this proposition. *See Mais*, 768 F.3d at 1123 ("the FCC recently ruled 'that the TCPA does not prohibit a caller from obtaining consent through an intermediary.' *In re GroupMe, Inc./Skype Commc'ns*

---

[5] As noted by defense counsel at the hearing, Plaintiff did not depose Brightwell about the agreement or otherwise seek to put the agreement into the record to demonstrate any purported discrepancy between it and the Brightwell affidavit.

[6] Although the phrases are now used interchangeably, traditionally *in behalf of* was used to mean "for the benefit of," while its counterpart *on behalf of* meant "as the agent of, on the part of." AMER. HERITAGE DICT., HarperCollins, 5th Ed. (2022).

*S.A.R.L. Petition*, 29 FCC Rcd. 3442, 3447 (2014)."). The FCC explained that "allowing consent to be obtained and conveyed via intermediaries in this context facilitates these normal, expected, and desired business communications in a manner that preserves the intended protections of the TCPA." *Id.* at 3445.

The *Mais* court explained that the analysis under the FCC's rulings turns on whether the called party granted permission to be called concerning a particular topic and not on how the calling party received the number. 768 F.3d at 1123 ("[T]he appropriate analysis turns on whether the called party granted permission or authorization, not on whether the creditor received the number directly."). Thus, a party that receives an individual's phone number indirectly may nevertheless have consent to call that individual. *Id.* at 1123–24.

In *Mais*, the wife included her ill husband's phone number on his hospital admission paperwork indicating the hospital could release his information for purposes of his treatment or related to billing. The appellate court concluded that Mais, through his wife, gave the hospital permission to transfer his number for billing purposes and thus, "the wireless number was provided by the consumer to the creditor" in satisfaction of the prior express consent exception. *Id.* at 1125. Courts have recognized, however, "the scope of consent must be determined upon the facts of [the] situation [in which the person gave consent]." *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 793 (9th Cir. 2018) (quoting In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961, 7990 (2015)). As discussed above, Morris consented to be called regarding "treatment options, health-related

information, disease-management programs, wellness programs, products, services . . . .” Thus, the CPAP refill reminder calls were within the scope of the consent given.

Morris cites *Shaikh v. Fairway Indep. Mortg. Corp.*, No. 21-CV-5715, 2025 WL 692104, at *1 (N.D. Ill. Mar. 4, 2025), for the proposition that prior express consent provided to one party is not transferrable to another entity. Doc. 201. The facts of *Shaikh* are distinguishable from the instant case. In *Shaikh*, plaintiff provided his contact information and express consent to be contacted to LendingTree. *Id.* Plaintiff’s agreement with LendingTree permitted LendingTree to share his information with up to five Network partners. LendingTree did <u>not</u> provide that contact information to defendant Fairway, who was one of LendingTree’s approximately 2,500 Network partners, but Fairway nevertheless obtained the number and sent prerecorded telemarketing calls to plaintiff. *Id.* Plaintiff Shaikh sued Fairway for violating the TCPA. *Id.* The district court denied Fairway’s motion for summary judgment because “a reasonable jury could find that Shaikh’s agreement with LendingTree did not provide his express consent to receive prerecorded calls from Fairway.” *Id.*

In contrast here, Morris provided her cellular phone number and expressly consented to receive calls by “or on behalf of” AHP regarding her CPAP supplies. AHP provided Morris’s number to its affiliate Lincare for purposes of patient care and re-supply responsibilities for Morris’s account. The undisputed evidence shows Lincare took over the servicing of AHP patients in Jacksonville. Lincare used the phone number it got from AHP to call Morris regarding her CPAP supplies within the eight-year time frame Morris’s doctor indicated she would need supplies. On the

22

undisputed facts, Morris provided express consent to receive calls from AHP or on its behalf regarding products and services related to her care, and the Health Care Rule, discussed below, applies to exempt Lincare's calls from the TCPA.

2.    Health Care Rule

This rule was codified after the FCC issued an order in 2012 "tightening the restrictions for automated telemarketing calls under the TCPA ...." *Jackson*, 2016 WL 5907917, at *3. The FCC heightened the consent requirement for certain automated telemarketing calls, requiring a TCPA caller to obtain prior express written consent, as opposed to the statutorily required prior express consent. *See id.* (citing In re Rules & Regulations Implementing the Tel. Consumer Protection Act of 1991, 27 FCC Rcd. 1830, 1838 ¶ 20 (Feb. 5, 2012). It was in this heightened-consent-requirement order that the FCC carved out the Health Care Rule exception.

The Health Care Rule states:

> No person or entity may: ... Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers [listed, including cellular telephone lines], other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call . . . delivers a 'health care' message made by, or on behalf of, a 'covered entity' or its 'business associates,' as those terms are defined [by HIPAA].

47 C.F.R. § 64.1200(a)(2). By its express language, the Health Care Rule applies to a health care message even if it "includes or introduces an advertisement or constitutes telemarketing." 47 C.F.R. § 64.1200(a)(2).

Morris relies on *Lawson v. Visionworks of Am., Inc.*, 741 F. Supp. 3d 1251, 1254 (M.D. Fla. 2024), to argue that Lincare's calls here were merely a pretext for the sale of goods or services. Morris's reliance on *Lawson* is misplaced for at least two reasons. First, the *Lawson* court was considering the matter on a motion to dismiss and thus had to accept as true the plaintiff's allegations in his complaint. Second, the *Lawson* plaintiff alleged that he attempted to opt out of the text messages on more than one occasion, but the unwanted messages continued. *Id.* at 1253. This matter is before the Court on summary judgment with a more fully developed record and the Court can go beyond the allegations of Plaintiff's Complaint. Moreover, there is no indication that Morris ever attempted to opt out of the messages or advise anyone she did not want to be contacted.

Morris also argues that the calls were primarily sales calls made from a call center with "power hours" in which sales representatives compete as to the number of calls they can place in a month. Even accepting these facts in a light favorable to Morris, that does not, on its own, negate that the calls were healthcare-related and/or exempt under the Health Care Rule. As indicated above, the Health Care Rule exception is within the regulations prohibiting telemarketing messages. Thus, some telemarketing or advertising component will be inherent in the messages themselves. Relevant here, HIPAA exempts from its definition of marketing all communications made "[f]or treatment of an individual by a health care provider . . . or to direct or recommend alternative treatments" to the individual. 45 C.F.R. § 164.501. Additionally, HIPAA specifically carves out of its definition of "Marketing" any

"communication made: (i) To provide refill reminders." *Id.* § 164.501. Thus, notwithstanding Morris's protests that the calls were made for telemarketing purposes, a healthcare message that is exempt under the Health Care Rule may include an advertising or telemarketing message and not lose its exempt status.

In determining whether the calls constitute health care messages for which only prior express (not written) consent is required, both sides rely on *Zani v Rite Aid*, 246 F. Supp. 3d 835 (S.D.N.Y. 2017), *aff'd* 725 F. App'x 41 (2d Cir. 2018), which found "at least three factors may be material to whether a call conveys a health care message as a matter of law." *Id.* at 851. Morris argues all three factors must be met. Lincare argues that the *Zani* factors are not requirements but instead are factors for courts to consider and weigh. In relevant part, the *Zani* court stated:

> First, if such a call concerns a product or service that is inarguably health-related, as narrowly defined by the FTC, it likely conveys a health care message. Such category would include the administration of medication "prescribed by a doctor or other healthcare provider," but would not include any product simply because it may be construed to benefit a consumer's health. FTC Guidance, *supra.* Second, if such a call is made by or on behalf of a health care provider to a patient with whom she has an established health care treatment relationship, that too is material to application of the rule. *See* 2012 Order at 1855 ¶ 63 (describing such calls as placed by or on behalf of "the consumer's health care provider to the consumer ... concern[ing] the consumers' health"). Finally, if the call concerns the individual health care needs of the patient recipient, that too is material. *See id.* The operative question as to this last factor would be whether a nexus exists between the subject matter of the call and the established health care needs of its recipient.

*Id.* at 851.

As to the first factor whether the call is health-related, HIPAA defines health care to include "care, services, or supplies related to the health of an individual" including but not limited to "[s]ale or dispensing of a . . . device, equipment, or other item in accordance with a prescription." 45 C.F.R. § 160.103. It is undisputed that a prescription is required for CPAP equipment and supplies. The Court finds that the messages left on Morris's and the class members' cell phones regarding refill reminders for their CPAP supplies were unquestionably health-related such that they conveyed a health care message. Morris does not vigorously dispute this.

As to the second factor, whether the "call is made by or on behalf of a health care provider to a patient with whom she has an established health care treatment relationship," Morris submits she and the class members have no relationship with Lincare. She contends this is further evidenced by the Brightwell declaration that explained Lincare established "new" patient profiles for the transferred AHP patients. Doc. 189-7 ¶ 6. Lincare responds that Morris's relationship with AHP, for which Lincare took over the responsibilities, satisfies the relationship prong. Even accepting that Lincare had to set up "new" profiles for the AHP patients as Morris argues, the Court again finds the language "on behalf of" to be relevant. The Health Care Rule specifically references health care messages made by, or on behalf of, a covered entity or its business associates. Morris does not dispute she had a health care treatment relationship with AHP. As discussed above, on this record, the Court finds that Lincare was making the calls to Morris and the class on behalf of AHP. Significantly,

26

Morris and the class members were told by letter about the Lincare/AHP transition. Brightwell also provided an affidavit explaining Lincare's role in taking over the servicing of the Jacksonville call center patients.

Additionally, Lincare argues the facts here are similar to those in *Zani* where that court found the plaintiff had an established health care relationship with the defendant Rite Aid HQ even though Rite Aid HQ did not itself directly provide prescriptions or health care to plaintiff, but rather Rite Aid HQ was an affiliate of Rite Aid New York which operated the pharmacy plaintiff used. Similarly, although Lincare did not provide the initial care, the affiliated relationship between Lincare and AHP supports a finding that the calls were made on behalf of a health care provider with whom Morris had a relationship.

The third *Zani* factor considers whether the "call concerns the individual health care needs of the patient recipient." Morris argues the generic message of the recording,[7] the defendant's lack of knowledge of her personal health care/records, and the fact it did not call her until four years after her last order demonstrate the calls did not concern her or the class members' individual needs. Lincare responds this factor is met because the calls were made based upon when the recipient would be expected to need to order CPAP supplies. Lincare argues, like in *Zani*, the calls satisfied the third factor because they "alerted . . . patients to the availability of a medication treating the

---

[7] The messages left did not specifically identify Lincare or that it was calling regarding CPAP supplies. Lincare explains its voice mail messages are intentionally non-specific so as not to run afoul of HIPAA in the event someone besides the patient picks up the message.

precise medical issue for which they had previously sought care." 246 F. Supp. 3d at 852. *Zani* involved calls regarding prescription flu shot reminders. Rite Aid only sent the flu shot reminder calls to patients of Rite Aid pharmacies who had received a prescription flu shot the previous year from those pharmacies. *Id.* Such flu shot reminder calls were found not to violate the TCPA. In discussing this factor, the *Zani* court found significant whether a nexus exists between the subject matter of the call and the established health care needs of its recipient. Morris testified that she knew she would need supplies for approximately eight years and AHP provided her with a guideline of when supplies were needed which she tried to follow. Although a closer call exists as to this factor, because of the timing of Lincare's calls to Morris, the Court concludes that the CPAP supply reminder calls at issue here similarly alerted patients to the availability of CPAP supplies in a manner consistent with when such supplies would need to be renewed. A nexus exists between the subject matter of the call and the established health care needs of Morris.

Upon consideration, the Court finds that the calls placed by Lincare to Morris and the class members fall within the Health Care Rule exception to the TCPA so that only prior express consent, not written consent, was necessary and that such consent was provided.[8] This case is not a situation in which Plaintiffs were receiving calls from some company out-of-the-blue with whom they had no relevant connection. For example, in *Murtoff v. My Eye Dr.*, plaintiff started receiving automated phone calls

---

[8] Given this finding, the Court does not reach Lincare's alternative argument that even if written consent were required, it substantially complied.

from MyEyeDr., reminding her that she was due for an annual eye exam, a couple of years after she had made a single inquiry to one of defendant's optometry offices for a price quote on a pair of glasses. *Murtoff v. My Eye Dr.*, *LLC*, No. 1:21-CV-02607, 2024 WL 4278033, at *1 (N.D. Ill. Sept. 24, 2024). While the pre-recorded calls were inarguably health-related, on the facts of that case, there was no established health care relationship because that plaintiff never received any treatment nor had any relationship with defendant. Instead, this case is more factually similar to those cases, like *Zani*, involving reminder flu shot calls to patients who had previously received a flu shot or other health care from the defendant or its affiliate such that there was an established health care relationship. *See, generally, Zani*, 246 F. Supp. 3d at 851; *Bailey*, 2018 WL 3866701, at *6; *Latner v. Mount Sinai Health Sys., Inc.*, 879 F.3d 52, 55 (2d Cir. 2018), as amended (Jan. 9, 2018); *Jackson*, 2016 WL 5907917, at *8–9 (holding that a generic flu shot reminder call does not violate the TCPA, as such calls fall within the Health Care Rule exemption).

### B. Morris's Motion on the TCPA Claim

In her motion, Morris argues there is no dispute that Lincare called her and the class members using a prerecorded voice message. While this is correct, Morris's motion for summary judgment still fails. Morris argues that because Lincare's calls were telemarketing calls, Lincare must have obtained her prior written consent. The Court disagrees. Based on the undisputed facts presented in this case and considering the *Zani* factors, Lincare has established that the Health Care Rule applies to the prerecorded messages left by Lincare on Morris's cell phone. In support of her motion,

29

Morris proffered evidence that the calls were placed by telemarketers hoping to receive a return call to order supplies. Notwithstanding, even though the calls contained a telemarketing component, the Health Care Rule still applies to the messages left by Lincare for the reasons discussed in section (A)(2) above. As a result, only prior express consent was required, not written consent.

Morris next argues she is entitled to judgment in her favor because although she may have provided to AHP prior consent to be called, she did not provide prior express consent to Lincare. The Regulations clearly indicate that providing one's telephone number constitutes consent for which the number was provided. By signing the consent form, Morris provided her phone number and provided her prior express consent to be called by AHP, or by an entity on AHP's behalf, regarding products and services related to her health care. On the record before the Court, Lincare is considered an entity on behalf of AHP. The messages left on Morris's phone related to her healthcare supplies. Thus, when servicing Morris's account for AHP, Lincare could rely upon the prior express consent Morris gave to AHP (or an entity on AHP's behalf) to be called about her CPAP supplies. Lincare's calls to Morris did not violate the TCPA. Accordingly, Morris's motion for summary judgment on Count I of her Second Amended Complaint is due to be denied.[9] Lincare's motion for summary

---

[9] The Court is not unsympathetic to a plaintiff's complaints of receiving unexpected and nonconsensual telemarketing calls to one's cell phone. And the Court's ruling here is not intended to open the floodgates to finding consent with any affiliate's calls. As stated by the FCC, "the scope of consent must be determined upon the facts of [the] situation." In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 30 F.C.C. Rcd. 7961, 7990 (2015). The undisputed facts here, however, show that Lincare's calls to Morris were made

judgment on the TCPA claim is due to be granted as to Morris and the TCPA class members. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1312 (11th Cir. 2012) ("Class action judgments will typically bind all members of the class.").

## C.     FTSA

Plaintiff's remaining claim in Count II (FTSA) arises under Florida statutory law. Although similar in many aspects to the TCPA, the FTSA differs materially, as relevant to the issues in this case, because it does not have a "Health Care Rule" exception to telemarketing calls.[10] Thus, the resolution of the FTSA claim will require analysis of Florida law. "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Upon careful consideration, as this action is not currently scheduled for trial, the Court will decline to exercise its supplemental jurisdiction over the remaining state law claim.[11] *See* 28

---

on behalf of AHP, the messages left fell within the Health Care Rule exception to the TCPA, and Morris provided her prior express consent to be called.

[10] Additionally, the FTSA prohibits "unsolicited calls," defined under Florida law as calls by a telephone solicitor who does not have a "prior or existing business relationship" with the person called. *See* Fla. Stat. § 501.059(1)(k). The TCPA, on the other hand, permits health-care related calls by, *or on behalf of* a "covered entity" or its "business associate," as defined by HIPAA. *See* 47 C.F.R. § 64.1200(a)(2)*;* 45 CFR 160.103.

[11] The period of limitations for any claim asserted under subsection (a) [establishing supplemental jurisdiction] . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d). Section 1367(d) "protects plaintiffs who choose to assert supplemental state-law claims in a federal action. If the court declines to exercise supplemental jurisdiction over those claims, the plaintiff may assert them in a new action in state court without fear of being barred

U.S.C. § 1367(c)(3) ("[D]istrict courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."); *see also Jordan v. Mosley*, 298 F. App'x 803, 806 (11th Cir. 2008) (citing *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) (the decision whether to exercise supplemental jurisdiction is within the discretion of the district court and we have "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial")). Accordingly, it is hereby

**ORDERED AND ADJUDGED**:

1. As to the federal TCPA claim in Count I of the Second Amended Class Action Complaint, Defendant Lincare, Inc.'s Motion for Summary Judgment (Doc. 188) is **GRANTED**, and Plaintiff Janet Morris's Motion for Summary Judgment (Doc. 189) is **DENIED**.

2. The Clerk is directed to enter Judgment in favor of Defendant Lincare, Inc. and against Plaintiff Janet Morris and the Class Members, as to the federal TCPA claim in Count I of the Second Amended Class Action Complaint.

3. The Court declines to exercise supplemental jurisdiction over the FTSA state law claim against Lincare, Inc. in Count II of the Second Amended Class Action

---

by the statute of limitations. This obviously protects plaintiff when state law might not have provided for tolling during the pendency of the federal-court case." 13D Charles Alan Wright et al., Federal Practice & Procedure § 3567.4, 458–59 (3d ed. 2008).

Complaint. Count II of the Second Amended Class Action Complaint is **DISMISSED**

**without prejudice**.

4.      The Clerk is further directed to terminate any pending motions and

deadlines and **CLOSE** this case.

**DONE AND ORDERED** in Tampa, Florida on September 17, 2025.


*Charlene Edwards Honeywell*
Charlene Edwards Honeywell
United States District Judge


Copies to: Counsel of Record and Unrepresented Parties, if any